**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Franjo IVIC, Nedjelko Sovulj, Ivan Cale and Stipe Ivkosic,
Defendants-Appellants.**

**Nos. 296, 297, 286, 301, Dockets 81–1350, 81–1351, 81–1352, 81–1353.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 15, 1982.
Decided Jan. 25, 1983.

---

(*Id.*)

See also, D.C., 508 F.Supp. 1038.

Stuart J. Baskin, Asst. U.S. Atty., S.D. N.Y., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Roanne L. Mann, Asst. U.S. Atty., New York City, of counsel), for the United States of America.

Michael D. Monico, Chicago, Ill. (Barry A. Spevack, Chicago, Ill., of counsel), for Franjo Ivic and Nedjelko Sovulj.

Frank A. Lopez, Brooklyn Heights, N.Y. (Meyer, Light, London & Lopez, Brooklyn Heights, N.Y.), for Ivan Cale.

J. Radley Herold, White Plains, N.Y., for Stipe Ivkosic.

Before FEINBERG, Chief Judge, and FRIENDLY and OAKES, Circuit Judges.

FRIENDLY, Circuit Judge:

These appeals from judgments of conviction in the District Court for the Southern

District of New York, after a trial before Judge Pollack and a jury, concern the terrorist activities of four Croatian nationalists from mid-November to mid-December, 1980. During this one-month period, a Joint Terrorism Task Force, made up of Special Agents of the Federal Bureau of Investigation (FBI), detectives of the New York City Police Department Arson and Explosives Section, as well as other FBI personnel, including a number of agents and translators able to understand Serbo-Croatian, conducted a large scale investigation, including the operation of four interception devices, the execution of eight search warrants, and around-the-clock physical surveillance of the four appellants and their coconspirators. This investigation culminated in the apprehension of these four appellants without the loss of life or limb or the destruction of property which the evidence demonstrated they intended. After thorough consideration of appellants' many contentions, we affirm all the convictions except those on Count One under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(d). As to these we hold that appellants' acts and plans, however misguided, are not within RICO.

### The Facts

The evidence at trial showed the following:[1] Defendants, Cale, Ivic, Sovulj, and Ivkosic, were active partisans of Croatian independence, committed to the separation of Croatia from Yugoslavia.[2] Defendant Cale owned a house at 31 North Eckar St., Irvington, New York. He lived on the bottom floor of the house and rented the top floor to defendant Ivkosic. Defendant Ivic, who had preceded Ivkosic as Cale's tenant, resided at 381 Broadway, Dobbs Ferry, New York. Ivkosic was the owner of a white Chevrolet van, registered to him at the North Eckar St. address.

In the early morning hours of November 18, 1980, surveillance agents of the FBI observed Ivkosic drop off his white van at Ivic's residence. Ivic then drove the van to Astoria, in the borough of Queens, where he picked up defendant Sovulj. Together Ivic and Sovulj drove to the intersection of 43rd St. and Broadway in the same borough, arriving there at 8:20 a.m. They parked on 43rd St., just north of Broadway, and replaced the left rear glass window of the van with a cardboard screen, leaving a two-inch opening at the top. Except for a five-minute interval during which the van circled the block, Ivic and Sovulj remained inside the parked but idling van until 8:54 a.m., peering through the aperture southwards down 43rd Street. The significance of the location was that one Joseph Badurina lived with his wife and children at 32–18 43rd St., just south of Broadway. Badurina was a prominent Croatian journalist and politician, the Secretary General of the Croatian National Congress, an umbrella organization for various Croatian groups, and editor of the Congress' publication, The Messenger. Badurina was a strong advocate of Croatian independence but a steadfast and vocal opponent of violence. He had previously published in The Messenger an open letter to the Croatian community from then U.S. Attorney Robert Fiske, Jr., along with an editorial endorsing it. These views had not endeared him to those in the Croatian

---

1. A considerable part of the evidence was obtained as a result of electronic surveillance authorized by District Judge Owen of the Southern District and District Judge Platt of the Eastern District of New York. We shall discuss below the questions raised as to the legality of this surveillance.

2. Croatian nationalism has roots deep in the nineteenth century, when Croatia was part of the Hapsburg Empire. The formation in 1918 of the Kingdom of Serbs, Croats, and Slovenes, renamed the Kingdom of Yugoslavia in 1929, did not fully satisfy Croatian nationalist aspira-

tions. A nominally independent state from 1941 to 1945, Croatia has been since 1945 one of the six constituent republics of the Federal People's Republic of Yugoslavia. Separatist agitation has persisted in the post-World War II period, despite the decentralizing policies followed by the Belgrade Government. The Croats are the second largest national group in Yugoslavia, after the Serbs. Their differences with the latter are ethnic, religious (they are Roman Catholics and the Serbs Orthodox), and linguistic (though their spoken language is the same, their alphabets are different).

independence movement who favored less gentle methods: Indeed, on at least one occasion his life had been threatened in a leaflet distributed by a member of OTPOR, a Croatian separatist organization of which defendants were members.

Badurina routinely walked his young daughter to school in the morning along 43rd Street, directly passing the spot where Ivic and Sovulj sat in the idling van on the morning of November 18. His regular practice was to leave his home between 8:25 and 8:30 a.m., drop off his daughter, and return alone by 9:15 a.m. Alerted by the FBI, Badurina took a different route on November 18 and thereafter did not venture outside his home for the next four weeks.

On the mornings of November 24 and 25 and December 10, Ivic and Sovulj or, on the latter date, Ivic alone, repeated essentially the same maneuver. After the November 24 visit FBI agents followed Ivic back to Dobbs Ferry. When he exited the van, he was seen carrying a slender object, two and one half to three feet long, wrapped in some sort of white covering. Ivic cradled the object in his arm as one would a rifle.

A subsequent search of Ivkosic's van, pursuant to warrant, yielded the cardboard screen cut to fit the rear view window. The cardboard box from which the screen had been cut was found in Cale's basement, as was a loaded Dutch 30.06 semi-automatic rifle mounted with a high-powered Mayflower scope. The rifle was inside a camouflage bag, which was in turn secreted beneath white painter's drop-cloths.

This and other evidence of a conspiracy to kill or otherwise injure Badurina, including statements by Sovulj to FBI agents denying ever being with Ivic in a white van anywhere in Queens, furnished the basis for Count 7 of the indictment, charging a conspiracy to violate Badurina's civil rights in violation of 18 U.S.C. § 241, and also furnished a possible predicate act for the RICO count (Count 1), charging a conspiracy under 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c).

On November 28, 1980, Ivic and Cale talked about possible bombings. After discussing bomb construction techniques and the availability of dynamite, they identified prospective bombsites, describing one as "at the end of this avenue" and another as a "studio". It was agreed that Ivkosic would "show the way". Next day, immediately after Cale ordered him to obtain dynamite and "smash it however you want", Ivic drove Ivkosic's car to Bridgeport, Connecticut. There he made two stops, the first at the J & I Machine Shop and the second on Colony Street, near the residence of one Ante Caron, a J & I employee. On his return to his residence in Dobbs Ferry, Ivic removed a telephone company shopping bag from the car and carried it inside. Some forty-five minutes later he carried the same bag outside, placed it in Ivkosic's car, and drove to New York City where he joined Ivkosic in a Croatian demonstration outside the Yugoslav Consulate on Madison Avenue. With Ivkosic driving, the two men proceeded to the south end of Fifth Avenue. After circling Washington Square twice and then Union Square once in very heavy traffic, Ivkosic stopped the car in a crosswalk at the intersection of 16th St. and Union Square West. Ivic left the car briefly to inspect the premises at 19 Union Square West where the George Tomov Yugoslav Folk Dance Ensemble maintained a studio. Tomov had rented the studio for that evening to groups giving a party to celebrate Yugoslavia's Independence Day. The party had been widely advertised in the Yugoslav community and was expected to draw prominent Yugoslav officials, including the Yugoslav Ambassador to the UN and members of the Yugoslav Consulate. A search of Ivic's residence on December 12, 1980, pursuant to warrant, turned up the telephone company shopping bag which had been in the car when Ivic and Ivkosic stopped outside the dance studio on the afternoon of November 29. Inside the bag were assorted bomb paraphernalia and a lady's purse [3] containing a fully operational

---

**3.** The particular significance of this purse was that Cale and Ivic had emphasized the desira-

time-bomb, consisting of 3 cartridges of 80% gelatin dynamite connected to an electric blasting cap and a clock. The time-bomb was set to explode five hours after circuitry contact was made. Thus, had the bomb been placed at the dance studio during the afternoon of November 29, it would have exploded in the middle of that evening's Independence Day festivities. Ivic did not in fact place the bomb because, as he explained later to Cale, "There was no place to park. And at the last moment you have to put that thing together, you understand?". A search of the Caron residence on Colony Street in Bridgeport on December 18, 1980, again pursuant to warrant, yielded eleven cartridges of 80% gelatin dynamite and electric blasting caps identical to the three cartridges and blasting cap in the time-bomb found in the telephone company bag in Ivic's apartment. This and other evidence furnished the basis for Count 2, charging a conspiracy to transport and utilize explosives in violation of 18 U.S.C. §§ 371 and 844, for Count 3, a substantive count for unlawful interstate transportation and receipt of explosives in violation of 18 U.S.C. §§ 844(d) and 2, and for Counts 4 and 5, charging attempts by means of explosives to damage and destroy, respectively, the vicinity of Washington Square Park[4] and a building on Union Square West, in violation of 18 U.S.C. §§ 844(i) and 2, as well as providing two possible predicates for the RICO conspiracy count.

The next bombing site selected was the Rudenjak Overseas Travel Service, a travel agency which specialized in booking trips to Yugoslavia. On the morning of December 4, Ivic surveilled the agency's office, located at 550 East 187th St. in the Bronx. Next afternoon he reported to Cale that the only effective way to destroy the agency was to leave the bomb in a garbage can outside the front display window. Cale concurred and authorized the operation, telling Ivic "I

would do it .... There is no risk here." However, a few hours later that same day, Cale, Ivic, and Ivkosic discovered loose wires in Cale's basement. Fearing that they had been subject to electronic surveillance, they abandoned the plan. This and other evidence furnished the basis for Count 6, charging an attempt to damage and destroy, by means of explosives, a travel agency located in the Bronx, in violation of 18 U.S.C. §§ 844(i) and 2, and also provided another possible predicate for the RICO conspiracy count.

We need only add that the searches on December 12, 1980, of Cale's residence, Ivkosic's van, and Ivic's apartment yielded, in addition to the loaded Dutch 30.06 military rifle, the cardboard box and screen cut therefrom, and the telephone company bag which we have already mentioned, a supply of 30.06 and .38 calibre ammunition, a loaded revolver, and two copies of a pamphlet entitled "Headquarters of the Croatian Revolutionary Forces". The search of the Caron residence in Bridgeport on December 18, 1980, produced a haul which the Government characterizes as "an arsenal of weapons and ammunition"—including, in addition to the previously mentioned dynamite and blasting caps, a second Dutch military rifle virtually identical to that found in Cale's basement, a silencer, and several hundred rounds of ammunition. Also found were a copy of the same "Headquarters of the Croatian Revolutionary Forces" pamphlet and a manual detailing procedures for constructing terrorist weapons, including timebombs.

### The Indictment, the Verdict and the Sentences

The indictment, the verdicts and the sentences so far as concerns the four appellants are set out in the following table:

---

bility of having the bomb placed at the studio by a woman, whom they said Sovulj had agreed to supply.

4. Apparently this concerned the cruising immediately antecedent to the stop on Union Square.

| Count | Charge | Defendant | Verdict | Sentence (Years) |
|---|---|---|---|---|
| 1 | Conspiracy to violate 18 U.S.C. § 1962(c): 18 U.S.C. § 1962(d) (RICO) | Cale Ivic Ivkosic Sovulj | Guilty Guilty Guilty Guilty | 15 15 15 10 |
| 2 | Explosives conspiracy: 18 U.S.C. §§ 371 and 844 | Cale Ivic Ivkosic | Guilty Guilty Guilty | 5 5 5 |
| 3 | Transportation and receipt of explosives: 18 U.S.C. §§ 844(d) & 2 | Cale Ivic Ivkosic | Guilty Guilty Guilty | 5 5 5 |
| 4 | Attempt to use explosives (Washington Square): 18 U.S.C. §§ 844(i) & 2 | Cale Ivic Ivkosic | Not guilty Not guilty Not guilty | |
| 5 | Attempt to use explosives (Union Square studio): 18 U.S.C. §§ 844(i) & 2 | Cale Ivic Ivkosic | Guilty Guilty Guilty | 10 7½ 5 |
| 6 | Attempt to use explosives (travel agency): 18 U.S.C. §§ 844(i) & 2 | Cale Ivic | Guilty Guilty | 10 7½ |
| 7 | Conspiracy to violate civil rights (Badurina murder plot): 18 U.S.C. § 241 | Cale Ivic Ivkosic Sovulj | Guilty Guilty Guilty Guilty | 10 10 10 10 |

Sentences:

Cale: Sentences on counts 1 and 2 are consecutive, the total thereof to run concurrently with the sentences on counts 3, 5, 6, and 7, which are consecutive to one another. Total: 35 years.

Ivic: Same sentencing pattern. Total: 30 years.

Ivkosic: Same sentencing pattern. Total: 20 years.

Sovulj: Consecutive sentences on counts 1 and 7. Total: 20 years.

*Legality of the Electronic Surveillance*

As already stated, the extensive electronic surveillance carried out in this case was based on three district court orders dated November 20, November 25, and December 10, 1980. The first order, issued by Judge Owen of the Southern District and Judge Platt of the Eastern District of New York, authorized the installation and operation of interception devices inside Ivkosic's Chevrolet van and the living-dining room area of Cale's house at 31 North Eckar Street. This order named as subjects of the interception Cale, Ivic, and Sovulj, and "others as yet unknown", but did not name Ivkosic. The second order, issued by Judge Owen, named the same subjects and authorized the installation of an interception device in Cale's basement. The third order, likewise signed by Judge Owen, added Ivkosic as an interception subject, extended the authority to intercept conversations in Cale's living room and basement, and further authorized interception of wire communications on Cale's telephone.

Appellants mount a series of attacks on the legality of these orders. While we have little to add to the excellent opinion of Judge Pollack denying defendants' motion to suppress, 508 F.Supp. 1038 (S.D.N.Y.

1981), we shall deal briefly with certain of their contentions.

Appellants' principal challenge is to the initial order of November 20. They argue that if this was defective, the results of interceptions authorized by the later orders must also be suppressed since these were obtained, in considerable measure, by evidence secured as a result of the interceptions authorized by the November 20 order. We find it unnecessary to pass upon this contention since we are satisfied with respect to the legality of the November 20 order.

The November 20 order was based on a 14-page affidavit by Kenneth J. Maxwell, a Special Agent of the FBI in New York. Appellants claim that this affidavit failed to make the showing of probable cause required by 18 U.S.C. § 2518(3)(a). They contend that the affidavit merely lumped together a long recitation of past bombings and murders, to which it did not connect them, with an account of an altogether "innocent" visit of Ivic and Sovulj to Badurina's neighborhood. Appellants have grotesquely mischaracterized the Maxwell affidavit and fundamentally mistaken the standards governing the determination of probable cause.

As said in *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965), "[a]ffidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion". When so read, the Maxwell affidavit provided ample cause to believe that a conspiracy was afoot to kill or injure Joseph Badurina. Under the heading "Recent Surveillance" the affidavit treated in great detail the events witnessed by FBI agents on the morning of November 18, 1980. Specifically, it reported the following surveillance observations: that Ivic and Sovulj had driven a van to Badurina's street at the precise time of day when Badurina regularly walked his daughter to school; that they had positioned the van directly along the route ordinarily taken by Badurina and his daughter, replaced the van's rear window

with a cardboard screen over which they peered towards Badurina's house, and remained there in the idling van for upwards of twenty-five minutes; and that on the evening before as well as the evening after the trip to Badurina's neighborhood, Ivic had visited Cale's residence on North Eckar Street.

■ These surveillance observations were given unmistakable color by the following allegations: that Cale was the New York chapter President and Sovulj an active member of OTPOR, a multinational Croatian nationalist organization other members of which had engaged in gun running, bombings, and assorted violent crimes; that Cale's residence at 31 North Eckar Street had served as a regular meeting place for OTPOR members in the past; that the van driven by Ivic and Sovulj was registered to Ivkosic, who resided at Cale's house; that Badurina had written articles opposing the use of violence by Croatian groups and was working to expel OTPOR from certain Croatian political organizations; and that there had been one previous attempt and numerous threats on Badurina's life for supposed disloyalty to the Croatian cause. None but the willfully naive could doubt that all this afforded probable cause to believe that Cale, Ivic and Sovulj were engaging in a conspiracy to take Badurina's life. The fact, if it be such, that the events of November 18 are susceptible of perfectly "innocent" explanation does not defeat probable cause. See *United States v. Webb,* 623 F.2d 758, 761 (2 Cir.1980).

■ We likewise reject appellants' claim that the requests for the interception orders were not properly authorized by the Department of Justice under 18 U.S.C. § 2516(1). As noted by Judge Pollack, 508 F.Supp. at 1042, appellants seem to have abandoned the contention that telephonic approval from the Assistant Attorney General in charge of the Criminal Division, subsequently confirmed in writing, was insufficient; in any event we would reject any such contention for the reasons stated and on the authorities cited by the district judge. Here the argument seems rather to

be that Assistant Attorney General Heymann was "not presented with facts—as distinct from a request", Ivkosic brief at 8–9, and thus could not have made the "mature judgment" that *United States v. Giordano,* 416 U.S. 505, 515–16, 94 S.Ct. 1820, 1826–27, 40 L.Ed.2d 341 (1974), required. Even if we were to assume *arguendo* that 18 U.S.C. § 2516(1) requires that the Attorney General or specially designated Assistant Attorney General himself review the facts asserted to constitute probable cause and to justify the use of electronic surveillance, a proposition which the cases do not support, see, e.g., *United States v. Turner,* 528 F.2d 143 (9 Cir.), *cert. denied sub nom. Lewis v. United States,* 423 U.S. 996, 96 S.Ct. 426, 45 L.Ed.2d 371 (1975), *sub nom. Hackett v. United States,* 429 U.S. 837, 97 S.Ct. 105, 50 L.Ed.2d 103 (1976), that requirement would be fully met here. Complete texts of the Maxwell affidavit, the application, and the order appear to have been before the Assistant Attorney General when he authorized the interception request. AUSA Baskin so represented to Judge Pollack at the February 13, 1981 suppression hearing, offering even to call the FBI agent who had hand-delivered the affidavit, application, and order to Mr. Heymann. The fact that the application itself did not indicate that Mr. Heymann had such information before him, see Ivkosic brief at 8, is of no consequence.

Further point is made that the November 20 and 25 intercept applications did not name Ivkosic, as allegedly was required by 18 U.S.C. § 2518(1)(b)(iv), which provides that an application shall include "the identity of the person, if known, committing the offense and whose communications are to be intercepted." The Government's factual answer, that it did not have probable cause to believe that Ivkosic was involved in the criminal activities until he was observed driving a bomb around Manhattan on November 29, 1980, and that he was named in the next (and last) intercept application filed on December 10, 1980, seems convincing enough. Moreover, the Supreme Court has held that failure to comply with the identification requirement of § 2518(1)(b)(iv) does not, standing alone, invalidate an otherwise proper interception order, *United States v. Donovan,* 429 U.S. 413, 432–37, but see n. 23, 97 S.Ct. 658, 670–73, but see n. 23 (1977).

On the other issues raised with respect to the intercept orders—the alleged inadequacy of the showing that normal investigative procedures would not be successful, 18 U.S.C. § 2518(3)(c), and the alleged failure to satisfy the minimization requirement, 18 U.S.C. § 2518(5)—we are content to rest on the opinion of Judge Pollack, 508 F.Supp. at 1041–42.

### The RICO Count

Count 1 of the indictment entitled "Racketeering Enterprise" contains five paragraphs. The first alleged that appellants, three other individuals, and others unknown to the grand jury constituted an "enterprise" as defined by 18 U.S.C. § 1961(4). Although the statute defines this simply as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity", the indictment went on to say "to wit, a group of individuals associated in fact which conspired to engage in various criminal activities including acts and threats involving murder and arson as chargeable under the laws of the State of New York." The second paragraph charged that "[i]t was the primary object of this criminal enterprise" that the defendants "would and did use terror, assassination, bombings, and violence in order to foster and promote their beliefs and in order to eradicate and injure persons whom they perceived as in opposition to their beliefs." The third paragraph charged that it was "the primary means of this criminal enterprise" that defendants and their associates "would and did receive, transport, possess, conceal, stockpile, construct, and utilize explosives, blasting caps, bombs, rifles, handguns, silencers, and ammunition." The fourth paragraph charged that the defendants, "being associated with the criminal enterprise described in Paragraphs One through

Three, which enterprise was engaged in and the activities of which affected interstate and foreign commerce, did unlawfully, wilfully and knowingly conspire and agree to conduct and participate, directly and indirectly, in the affairs of that enterprise through a pattern of racketeering activity: that is, through two or more acts and threats of murder and arson in violation of" certain laws of the State of New York. The fifth paragraph alleged that "[i]n conducting the affairs of their criminal enterprise through this pattern of racketeering activity, the defendants and others with whom they were associated performed the following acts and actions among others." There followed a list of 27 acts reading like the listing of overt acts usual in a garden-variety conspiracy indictment but unnecessary in a RICO conspiracy indictment.

■ This count, and the judge's effort to enlighten the jury how to deal with it, have precipitated a large number of objections. Appellants contend that the indictment was defective in failing to give adequate notice of what predicate crimes the Government intended to rely upon to establish a "pattern of racketeering activity", as defined in

18 U.S.C. § 1961(1) and (5); that the Government failed to charge or prove the existence of a discrete ongoing organization existing apart from the alleged conspiracies to murder and place explosives, as allegedly required by *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); that the judge's instructions left the jury under the mistaken impression that proof of two of the 27 "steps" listed in the fifth paragraph of Count 1, many of them not crimes, would suffice as proof of the two acts of racketeering activity required by § 1961(5); and that in any event the consecutive sentences imposed on Cale, Ivic, and Ivkosic for Counts 1 and 2 and on Sovulj for Counts 1 and 7 constituted constitutionally impermissible double punishment. We find it unnecessary to consider these arguments since in our view the conduct charged in the indictment and proved at trial did not constitute an offense under § 1962(d) because, as the Government conceded at argument, it was neither claimed nor shown to have any mercenary motive.[5]

It is a truism that as was said with respect to this very Act in *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524,

---

5. The argument that RICO is inapplicable to a case where there is no charge of economically motivated activity was not advanced in any intelligible form in the district court. The brief (pp. 14–16) and reply brief (pp. 5–7) for Ivic and Sovulj in this court could be charitably read as making the point. However, after we had sharply raised the issue at oral argument we requested the Government and the appellants to submit letter briefs on the subject, which they have done. The Government, while arguing vigorously against the substance of the position we had suggested, does not claim there is any procedural bar to our taking note of it. This position was well advised. F.R. Cr.P. 12(b)(2) provides that the failure of an indictment to charge an offense "shall be noticed by the court at any time during the pendency of the proceedings." The term "pendency of the proceedings" had been consistently construed to encompass an appeal. See, e.g., *United States v. Thomas,* 444 F.2d 919, 920 n. 1 (D.C.Cir.1971) and cases cited there; *United States v. Clark,* 646 F.2d 1259, 1262 (8 Cir. 1981). See also *United States v. Wexler,* 621 F.2d 1218, 1223 (2 Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 119, 66 L.Ed.2d 48 (1980). Appellate courts are permitted, *Government of Virgin Islands v. Greenidge,* 600 F.2d 437, 439

n. 2 (3 Cir.1979), indeed required, *United States v. Meacham,* 626 F.2d 503, 509 (5 Cir.1980), to raise the issue *sua sponte.*

In addition, F.R.Cr.P. 52(b) provides that "plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." An appellate court may do this on its own motion. See *Screws v. United States,* 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 plurality opinion of Justice Douglas, 118, concurring opinion of Justice Rutledge, (1945); *Silber v. United States,* 370 U.S. 717, 82 S.Ct. 1287, 8 L.Ed.2d 798 (1962) (per curiam); *Fisher v. United States,* 328 U.S. 463, 467–68, 66 S.Ct. 1318, 1320–21, 90 L.Ed. 1382 (1946); *United States v. Bacall,* 443 F.2d 1050, 1063 (9 Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971); *United States v. Adams,* 634 F.2d 830, 836 (5 Cir.1981). See also *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936). The failure of an indictment to charge an offense has been noticed under Rule 52(b) even where the defect had not been raised either below or on appeal. See, e.g., *Chappell v. United States,* 270 F.2d 274, 276 (9 Cir.1959); *United States v. Clark,* 412 F.2d 885, 887–88 (5 Cir.1969).

2527, 69 L.Ed.2d 246 (1981), "[i]n determining the scope of a statute, we look first to its language." But it is equally true that, as was also said there, "there is no errorless test for identifying or recognizing 'plain' or 'unambiguous' language." *Id.* We must examine not merely the letter of a few of the bare words of the Act taken in isolation but, as the Court did in *Turkette,* the whole of the statute, and the expressed intention of its framers, and here, of course, the *Turkette* opinion itself. See *FBI v. Abramson,* 456 U.S. 615, 625 n. 7, 102 S.Ct. 2054, 2061 n. 7, 72 L.Ed.2d 376 (1982), and cases there cited.

The Government's argument is simplicity itself. Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt," and § 1962(d) makes it unlawful for any person to conspire to violate subsections (a), (b), or (c) of § 1962. The group of Croatian nationalists to which defendants belonged fit the definition of "enterprise" in § 1961(4) inasmuch as they comprised a "group of individuals associated in fact although not a legal entity". A conspiracy to participate in the conduct of this enterprise's affairs through a "pattern of racketeering activity" would be established by showing, as to each defendant, that he agreed to further the enterprise by committing two of the State law crimes listed in § 1961(1)(A), in this case, murder and arson. That is all.

The Court has generally declined to adopt so simplistic an approach. As said by Justice Frankfurter in *Griffiths v. Commissioner,* 308 U.S. 355, 358, 60 S.Ct. 277, 278, 84 L.Ed. 319 (1939), "[l]egislative words are not inert, and derive vitality from the obvious purposes at which they are aimed . . . ". As put by Justice Jackson in *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 350–51, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943), "courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy." (footnote omitted) To such an inquiry we now turn.

Section 1962(c) was one of three substantive crimes added to Title 18 of the United States Code by Title IX of the Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 941. The first, § 1962(a), makes it unlawful to use funds derived from a pattern of racketeering, as defined in §§ 1961(1) and (5), or from the collection of unlawful debt, as defined in § 1961(6), to acquire an interest in or to establish or operate an enterprise engaged in or affecting interstate or foreign commerce. The second, § 1962(b), makes it unlawful to acquire or maintain an interest in or control of such an enterprise through a pattern of racketeering activity or through collection of unlawful debt. The third, § 1962(c), the provision which defendants here were charged with conspiring to violate, makes it unlawful to conduct or participate in such an enterprise's affairs through a pattern of racketeering activity or through collection of unlawful debt.

When the same word is used in the same section of an act more than once, and the meaning is clear in one place, it will be assumed to have the same meaning in other places. See *United States v. Nunez,* 573 F.2d 769, 771 (2 Cir.), *cert. denied,* 436 U.S. 930, 98 S.Ct. 2828, 56 L.Ed.2d 774 (1978), and cases cited there. As it appears in subsections (a) and (b), the term "enterprise" quite clearly refers to the sort of entity in which funds can be invested and a property interest of some sort acquired, and hence the sort of entity which one joins to make money. Although perhaps somewhat wider in its reach than "business"; an "enterprise", as used in these subsections, is evidently an organized profit-seeking venture. There was no charge or proof of that in this case. Defendants joined together not to make money but, as the indictment itself stated, see pp. 58–59, *supra,* to

advance the goal of Croatian independence. They undertook to murder Badurina and to bomb the dance studio and the travel agency not to obtain money, but rather to eliminate political opponents, win publicity, or otherwise further their chosen cause.[6] If "enterprise" in subsection (c) is given the same meaning which that term clearly has in subsections (a) and (b), then the group to which the indictment charged and the proof showed that defendants belonged is outside its scope.

Regard must be paid also to the title of the statute, "Racketeer Influenced and Corrupt Organizations". As said by Chief Justice Marshall in *United States v. Palmer,* 16 U.S. (3 Wheat.) 610, 631, 4 L.Ed. 471 (1818), "[t]he title of an act cannot control its words, but may furnish some aid in showing what was in the mind of the legislature." See also *United States v. Fisher,* 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805); *Church of the Holy Trinity v. United States,* 143 U.S. 457, 462–63, 12 S.Ct. 511, 513, 36 L.Ed. 226 (1892); *Brotherhood of Railroad Trainmen v. Baltimore and Ohio, R.R.,* 331 U.S. 519, 528–29, 67 S.Ct. 1387, 1391–92, 91 L.Ed. 1646 (1947). In the ordinary use of language no one would choose "corrupt" as an appropriate adjective to describe members of an organization striving for the independence of their native land even by the most abhorrent means but without any desire for personal gain. Dangerous, vicious, misguided, blinded with anger, even savage and crazed, yes, but corrupt, no. So too with "racketeer influenced". Webster's New International Dic-

tionary (3d ed. 1963) defined a racketeer as "one who extorts money or advantages by threats of violence or by blackmail or by threatened or actual unlawful interference with business or employment" and a racket as "a fraudulent scheme, enterprise, or activity, . . . a system of obtaining money or other advantages illegally, fraudulently, or undeservedly. . . . " Definitions in other dictionaries that have been consulted are to the same effect. The words used by Congress have a familiar connotation to ordinary people as describing money-making activities about which they read in the newspaper every day. It would be stretching such words beyond permissible bounds to apply them to the terrorist activities of misguided patriots which, although likewise subject to condemnation, are worlds removed from that of such venal organizations as gambling, narcotics, or prostitution rings. "After all, legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him." *Addison v. Holly Hill Fruit Products, Inc.,* 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944).

Further light upon the meaning of § 1962(c) is cast by the statement of findings that prefaces the Organized Crime Control Act of 1970, 84 Stat. 922–23, which the Court quoted in *Turkette,* 452 U.S. at 588–89, 101 S.Ct. at 2531, and which we reproduce in the margin.[7] No one reading

---

**6.** The Government tells us that in some cases terrorist organizations have engaged in robbery or extortion to obtain money to further their activities. The applicability of RICO to such cases can be dealt with when and as they arise.

**7.** The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other

dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other

these words at the time of enactment would have thought them intended to apply to Croatian terrorists seeking to murder a leader of a rival faction or to scatter death, injury and destruction through a party celebrating Yugoslav Independence Day and a travel agency booking trips to Yugoslavia. Such activity, however horrible, does not "annually drain billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud and corruption." It has nothing to do with "syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation." The characterizations in items (3) and (4) are similarly wide of the mark of what is here before us.

We have likewise been instructed that "another guide to the meaning of a statute is found in the evil which it is designed to remedy; and for this the court properly looks at contemporaneous events, the situation as it existed, and as it was pressed upon the attention of the legislative body." *Church of the Holy Trinity v. United States, supra,* 143 U.S. at 463, 12 S.Ct. at 513. Title IX of the Organized Crime Control Act of 1970 (RICO) was the culmination of some two decades of Congressional concern about the infiltration of legitimate businesses by organized crime. See 115 Cong.Rec. 5872–90 (1969) (remarks of Sen. McClellan); Bradley, Racketeers, Congress, and the Courts: An Analysis of RICO, 65 Iowa L.Rev. 837, 838–45 (1980); Blakey and Gettings, Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts, 53 Temp.L.Q. 1009, 1014–21 (1980). From the start Congressional concern centered on the problem of "black money", the purchase and operation of legitimate businesses with the proceeds of illegal endeavors. See S.Rep. No. 141, 82d Cong., 1st Sess. 33 (1951). A regulatory approach to this problem was recommended in 1967 by the Katzenbach Commission, see President's Commission on Law Enforcement and Adminis-

tration of Justice, The Challenge of Crime in a Free Society (1967), and was adopted shortly thereafter by two Senate bills. The first, S. 2048, 90th Cong., 1st Sess. § (8) (1967), cast as an amendment to the Sherman Act, prohibited the use in one business of unreported income from another. The second, S. 2049, 90th Cong., 1st Sess. § 2(1) (1967), prohibited the investment in any business enterprise affecting interstate commerce of income derived from certain enumerated criminal activities (gambling, narcotics, extortion and the like). Though it incorporated several of the remedial features of the antitrust laws, S. 2049 was framed as independent criminal legislation. After vicissitudes unnecessary here to trace in detail, see "The Criminal Activities Profits Act", S. 1623, 91st Cong., 1st Sess., 115 Cong.Rec. 6925 (1969); Hearings on Measures Relating to Organized Crime Before the Subcomm. on Criminal Laws and Procedures of the Senate Comm. on the Judiciary, 91st Cong., 1st Sess. 387 (1969); Bradley, Racketeers, Congress, and the Courts, *supra,* 65 Iowa L.Rev. at 841, a new bill, S. 1861, 91st Cong., 1st Sess., 115 Cong.Rec. 9512 (1969), was introduced by Senators McClellan and Hruska as a final replacement for S. 2048 and S. 2049 and was included as Title IX of the Organized Crime Control Act. The Senate Report on the Act stated the purpose of Title IX to be "the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce". S.Rep. No. 617, 91st Cong., 1st Sess. 76 (1969). The House Report and the Congressional floor statements characterized RICO's purpose in like terms. See e.g., H.R.Rep. No. 1549, 91st Cong., 2d Sess. 57 (1970), U.S.Code Cong. & Admin.News 1970 p. 4007, 4033 ("Section 1962 establishes a threefold prohibition aimed at stopping the infiltration of racketeers into legitimate organizations"); 116 Cong.Rec. 18939 ("Title IX is aimed at removing organized crime from our legitimate organizations") (re-

---

sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies availa-

ble to the Government are unnecessarily limited in scope and impact.

marks of Sen. McClellan); 116 Cong.Rec. 35295 ("Perhaps the single most alarming aspect of the organized crime problem . . . has been the growing infestation of racketeers into legitimate business enterprises. This evil corruption of our commerce and trade must be stopped. Title IX . . . provides the machinery whereby the infiltration of racketeers into legitimate businesses can be stopped and the process can be reversed when such infiltration does occur.") (remarks of Rep. Poff, floor manager of the bill).

In sum, RICO is the lineal descendant of a pair of 1967 Senate bills designed to apply antitrust-type measures to the problem of "black money". Although the bill ultimately enacted as RICO went somewhat beyond this initial conception, preventing and reversing the infiltration of legitimate businesses by organized crime elements remained its core purpose. Mere statement of RICO's origins, most particularly of the mischief it was meant to remedy, indicates that political terrorism, at least when unaccompanied by any financial motive, see note 6 *supra,* is beyond its contemplated reach.

While *United States v. Turkette, supra,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246, held that the term "enterprise" as used in RICO encompasses illegitimate organizations, nothing there suggests that it reaches every such organization, even one whose animating long-run purpose and predicate crimes are political rather than pecuniary. Indeed, the rationale of *Turkette* points decidedly the other way. Acknowledging, in line with the legislative history we have summarized, that the "primary purpose of RICO is to cope with the infiltration of legitimate businesses", the Court reasoned that "applying the statute in accordance with its terms, so as to reach criminal enterprises, would seek to deal with the problem at its very source". *Id.* at 591, 101 S.Ct. at 2532. RICO's supporters, the Court said, "recognized that organized crime uses its primary sources of revenue and power—illegal gambling, loan sharking and illicit drug distribution—as a springboard into the sphere of legitimate enterprise". *Id.* Since RICO was intended not only to remedy but

also to prevent the infiltration of legitimate businesses, the exclusion from its reach of such criminal enterprises as drug, prostitution, and gambling rings would, the Court concluded, "ignore [its] preventive function". *Id.* at 593, 101 S.Ct. at 2533.

Under the rationale of *Turkette,* then, RICO arguably applies to any organization, legitimate or not, whose activities generate monies which can serve as a "springboard into the sphere of legitimate enterprise". On the other hand, groups whose activities generate no such monies are impliedly excluded; application of RICO to them could not conceivably work, even indirectly, to prevent the infiltration of legitimate businesses by criminal elements. The terrorist activities of political groups such as the one here simply do not "give rise to . . . concerns about infiltration", *id.* at 593, 101 S.Ct. at 2533, at least where, as here, these activities are not designed to obtain, and do not in fact yield, any money whatsoever.

Other statements by the sponsors of RICO indicate its inapplicability to crimes having no economic motivation. Senator McClellan, the principal sponsor of the Organized Crime Control Act of 1970, made clear on several occasions that the purpose of Title IX is "economic" and that the only crimes included in § 1961(1) are those adapted to "commercial exploitation". See, e.g., 116 Cong.Rec. 18940 (1970); The Organized Crime Act (S. 30) or Its Critics: Which Threatens Civil Liberties?, 46 Notre Dame Law. 55, 161–62 (1970). Responding to objections of the Association of the Bar of the City of New York and the ACLU that the list of predicate racketeering acts in § 1961(1) included offenses often committed by persons not involved in organized crime, Senator McClellan stated:

> It is self-defeating to attempt to exclude from any list of offenses such as that found in title IX all offenses which commonly are committed by persons not involved in organized crime. Title IX's list does all that can be expected, as does the list found in the electronics surveillance provisions of title III of the 1968 Safe

Streets Act—it lists offenses committed by organized crime with substantial frequency, *as part of its commercial operations.* The danger that commission of such offenses by other individuals would subject them to proceedings under title IX is even smaller than any such danger under title III of the 1968 act, since commission of a crime listed under title IX provides only one element of title IX's prohibitions. Unless an individual not only commits such a crime but engages in a pattern of such violations, and *uses that pattern to obtain or operate an interest in an interstate business,* he is not made subject to proceedings under title IX. (emphasis supplied)

116 Cong.Rec. 18940. See also 116 Cong. Rec. 18941 (§ 1962(b) and (c) "essentially proscribe acquisition or operation of a *business* through racketeering activity", emphasis supplied) (remarks of Sen. McClellan).

When Congress has desired to deal with terrorist activities, it has known how to do so. Destruction of and damage to aircraft and aircraft facilities, or motor vehicles and motor vehicle facilities, or disabling the crews of either, have long been federal crimes, 18 U.S.C. §§ 31–33, subject, if death should result, to a discretionary sentence of death or life imprisonment, § 34. See also 49 U.S.C. §§ 1472(i) (aircraft piracy) and (1) (carrying weapons, loaded firearms, and explosives aboard aircraft). Indeed, the Organized Crime Control Act itself contained one title, Title XI, extending federal criminal jurisdiction with respect to explosives which, as we have seen in this very case, see Counts 2 and 3, clearly comprehends the use of explosives in terrorist activities.

Indeed, application of RICO in the instant case seems to run counter to the Justice Department's own RICO Guidelines. These Guidelines, promulgated and made effective by the Criminal Division of the Justice Department on January 16, 1981, less than one month after this indictment was filed and some four months before the case went to trial, were intended to provide "detailed guidance" to federal prosecutors regarding "the use of RICO charges in

criminal investigations and prosecutions". Memorandum of Philip Heymann, Assistant Attorney General, Criminal Division (January 16, 1981). The Preface to these Guidelines states that RICO is "most directly addressed" to the "infiltration of organized crime into the nation's economy". More important, Guideline VI directs that "[n]o RICO count of an indictment shall charge the enterprise as a group associated in fact, unless the association in fact has an ascertainable structure which exists for the purpose of maintaining operations directed toward an *economic* goal, that has an existence that can be defined apart from the commission of the predicate acts constituting the patterns of racketeering activity." (Emphasis supplied) The commentary following this guideline again expressly states that the enterprise must be directed "toward an economic goal". While we recognize that non-compliance with internal departmental guidelines is not, of itself, a ground of which defendants can complain, *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. Myers,* 692 F.2d 823, 846 (2 Cir. 1982), these Guidelines nevertheless are important evidence of the understanding of the department of government charged with the administration of the statute. Cf. *Zemel v. Rusk,* 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965); *Blum v. Bacon,* 457 U.S. 132, 142, 102 S.Ct. 2355, 2362, 72 L.Ed.2d 728 (1982).

Although this court has been hospitable to the Government's use of RICO, see, e.g., *United States v. Altese,* 542 F.2d 104 (1976), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977), (anticipating the holding of *Turkette* that RICO applies to illegitimate businesses); *United States v. Angelilli,* 660 F.2d 23 (1981), *cert. denied,* 445 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982) (New York City Civil Court held a RICO "enterprise"), we warned in *United States v. Huber,* 603 F.2d 387, 395–96 (2 Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 758 (1980), "that the potentially broad reach of RICO poses a danger of abuse where a prosecutor attempts to apply the statute to situations for which it was

not primarily intended" and cautioned "against undue prosecutorial zeal in invoking RICO." If this case is any example, these cautions have not been sufficiently heeded in the Southern District of New York. We hold that when an indictment does not charge that an enterprise or the predicate acts have any financial purpose, it does not state a crime under § 1962(c).[8]

### Convictions under other counts

Invalidation of the convictions under Count 1 does not, of course, lead automatically to reversal of the convictions on the other counts. Cf. *United States v. Losada,* 674 F.2d 167, 170 (2 Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982) (dismissal of conspiracy count on double jeopardy grounds after close of Government's case or after verdict does not automatically require dismissal of convictions on substantive counts). Before addressing the specific objections made to these, we first consider whether the presence of the RICO count had any spillover effect sufficiently prejudicial to call for reversal.

■ We see no sufficient reason to think that it did. The evidence of defendants' acts was, to be sure, of the sort to arouse a jury, but substantially all the evidence adduced in support of the RICO count could and doubtless would have been presented under an indictment not containing that count. The elimination of the RICO count would not have significantly altered the trial strategy of the defense, see *Pacelli v. United States,* 588 F.2d 360, 366 (2 Cir. 1978), *cert. denied,* 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979). Still the jury was told that it could convict, and it in fact did convict, defendants of having conspired

to engage in a pattern of "racketeering" activity—a term having a decidedly pejorative connotation. We have noted before that "[o]ne of the hazards of a RICO count is that when the Government is unable to sustain a conviction under this statute, it will have to face the claim that the prejudicial effect of tarring a defendant with the label of 'racketeer' tainted the conviction on an otherwise valid count." *United States v. Guiliano,* 644 F.2d 85, 89 (2 Cir.1981). However, the Government's evidence here with respect to the ultimate facts on the other counts was so overwhelming that we do not believe any prejudice was caused; moreover, the jury's ability to overcome any prejudice or confusion resulting from inclusion of the RICO count is shown by their discriminating acquittal on Count 4.

■ The defendants' challenge to the sufficiency of the evidence to establish the assassination scheme charged in Count 7 does not warrant serious discussion. Although our summary of the evidence suffices to show this, it does not do justice to the wealth of detail adduced at trial. The surveillance observations, the intercepted conversations, the fruits of the searches, the false exculpatory statements by Sovulj, and Badurina's position in Croatian circles, not only justified but almost compelled the inference that, but for the FBI's warnings, defendants would have sought to take Badurina's life.

Defendants attack the convictions on the attempted bombings, Counts 5 and 6, on two related grounds. They claim, first, that the evidence was insufficient to prove an attempt as distinguished from mere preparation, and, second, that the judge's charge usurped the jury's function.

---

**8.** We are well aware that RICO contains a liberal construction clause, § 904(a), 84 Stat. 947, directing that "the provisions of this title shall be liberally construed to effectuate its remedial purposes". Our holding is fully consistent with this directive, since we are persuaded that construing RICO to cover terrorist activities of the sort before us here would in no way "effectuate its remedial purposes". See discussion, pp. 62–64, *supra.* Moreover, our holding does not rest to any extent on the

rule that criminal laws should be strictly construed or on the "rule of lenity", which § 904(a) arguably overrides. It rests rather on the venerable principle, applicable to all statutes, "that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Church of the Holy Trinity v. United States, supra,* 143 U.S. at 459, 12 S.Ct. at 512; *Muniz v. Hoffman,* 422 U.S. 454, 469, 95 S.Ct. 2178, 2187, 45 L.Ed.2d 319 (1975).

Many of our country's most distinguished judges have labored over the definition of an attempt, see, e.g., *Commonwealth v. Peaslee,* 177 Mass. 267, 272, 59 N.E. 55 (1901) (Holmes, J.); *People v. Werblow,* 241 N.Y. 55, 61–62, 148 N.E. 786 (1925) (Cardozo, J.); *United States v. Coplon,* 185 F.2d 629, 632–33 (2 Cir.1950), *cert. denied,* 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952) (L. Hand, J.), and over the years various approaches have been urged. Some courts and commentators have asked whether there was a physical or dangerous proximity to success; others whether the actor had reached a point where it was unlikely that he would have voluntarily desisted; still others whether the actor's conduct was by itself unequivocal evidence of criminal intent. See Model Penal Code, § 5.01(1)(c), Comment at 39–47 (Tent. Draft No. 10, 1960) (canvassing these and other approaches); Lafave and Scott, Criminal Law 431–438 (1972) (same). The drafters of the Model Penal Code considered and rejected all previous formulations in favor of one which provides, so far as here relevant, that "[a] person is guilty of an attempt ... if, acting with the kind of culpability otherwise required for commission of the crime, he ... purposely does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." § 5.01(1)(c) (Proposed Official Draft, 1962). Conduct "shall not be held to constitute a substantial step ... unless it is strongly corroborative of the actor's criminal purpose." *Id.,* § 5.01(2). This definition, by shifting the emphasis from what remains to be done to what the actor already has done, was designed to widen the ambit of attempt liability, consistent with the drafters' belief that

the proper concern of the law of attempts is the dangerousness of the actor, as a person manifesting a firm disposition to commit a crime, not the dangerousness of his conduct. See Model Penal Code § 5.01, Comment at 26, 47 (Tent. Draft No. 10, 1960).

The Model Penal Code formulation was substantially adopted by the Fifth Circuit in a scholarly opinion of the late Judge Rives, *United States v. Mandujano,* 499 F.2d 370 (5 Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975), and, shortly thereafter, by this court in *United States v. Stallworth,* 543 F.2d 1038 (2 Cir.1976), which has been followed, among other cases, in *United States v. Jackson,* 560 F.2d 112 (2 Cir.), *cert. denied,* 434 U.S. 941, 98 S.Ct. 434, 54 L.Ed.2d 301 (1977); *United States v. Manley,* 632 F.2d 978, 987–88 (2 Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981); and *United States v. Mowad,* 641 F.2d 1067, 1073 (2 Cir.), *cert. denied,* 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 86 (1981). However, this is a classic example of a legal doctrine where although the principle is clear, its application is fraught with difficulty. We observed in *United States v. Manley, supra,* 632 F.2d at 988, that the determination whether particular conduct constitutes a "substantial step" is "so dependent on the particular facts of each case that, of necessity, there can be no litmus test to guide the reviewing courts." It is difficult as a conceptual matter to do better than the Model Penal Code's statement that conduct "shall not be held to constitute a substantial step ... unless it is strongly corroborative of the actor's criminal purpose", but this is not language easy of application by a jury or even by an appellate court. Relevant to our task is the immediately following sentence of the Model Penal Code, which we set forth in the margin.[9]

9. Without negativing the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law:

(a) lying in wait, searching for or following the contemplated victim of the crime;

(b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;

(c) reconnoitering the place contemplated for the commission of the crime;

(d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;

(e) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or

We have no doubt of the sufficiency of the evidence with respect to the attempt to bomb the dance studio on Union Square (Count 5). The defendants charged in that count had obtained dynamite and bomb paraphernalia, constructed a fully operational time bomb, inspected the building to be bombed, picked a precise time for the bomb to explode, and transported the bomb to the close vicinity of the site. They had done every act that would have been involved in the complete crime save for setting the time bomb in place, and there is every reason to think they would have done that too had it not been for the unavailability of parking space. Here there was more even that a "substantial step", there was "dangerous proximity to success", *Hyde v. United States,* 225 U.S. 347, 388, 32 S.Ct. 793, 810, 56 L.Ed. 1114 (1912) (Holmes, J., dissenting).

The evidence with respect to the attempt to bomb the travel agency (Count 6) is much weaker. The evidence proved only that Cale and Ivic had discussed the bomb site and the best means of planting a bomb there, that they had acquired and had readily available the explosives needed to carry out the bombing, see Model Penal Code § 5.01(2)(e), that Ivic had reconnoitered the site, see *id.* § 5.01(2)(c), and that Cale had authorized the operation. In contrast to the Union Square dance studio episode, however, defendants never actually transported a bomb to the contemplated site, see *id.* § 5.01(2)(f). Although we share the view expressed by then Chief Judge Kaufman in *United States v. Stallworth, supra,* 543 F.2d at 1040, that society should be able "to punish malefactors who have unequivocally set out upon a criminal course without requiring law enforcement officers to delay until innocent bystanders are imperiled",

see also G. Williams, Criminal Law—The General Part 632 (2d ed. 1961), we are concerned that attempt liability, with its accompanying heavy penalties, not be imposed for remote preparatory acts insufficiently corroborative of a firm criminal purpose. Certainly the defendants in *Stallworth,* as well as those in *Jackson, Manley* and *Mowad,* had gone a great deal further toward commission of the crime than Cale and Ivic had gone with respect to the travel agency. In *Stallworth,* for example, it was said that at the time the police intervened a bank robbery was already "in progress", *supra,* 543 F.2d at 1041; there was no room whatsoever for doubt that defendants there had "unequivocally set out upon a criminal course." The Government cites *United States v. Brown,* 604 F.2d 347, 350 (5 Cir. 1979), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 347 (1980), as being "remarkably on all fours with this case." [10] In fact, however, the evidence there of planning—or at least of what Brown thought to be such—was considerably more extensive than here; on the other hand, in *Brown* explosives had not been procured, the persons relied upon to make the procurement being undercover agents. Recognizing that the question is inescapably "a matter of degree", see *United States v. Jackson, supra,* 560 F.2d at 120, we conclude that the evidence, viewed in the light most favorable to the Government, see *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), was sufficient, although barely so, to support the convictions on Count 6.

Defendants convicted on Counts 5 and 6 also challenge the judge's instructions. The principal claim concerns an instruction, given after the "substantial step" requirement was set out, that if the jury

which can serve no lawful purpose of the actor under the circumstances;

    (f) possession, collection or fabrication or materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

    (g) soliciting an innocent agent to engage in conduct constituting an element of the crime.

10. Decisions of the Fifth Circuit on the subject of attempt are peculiarly persuasive since that court's *Mandujuano* decision, *supra,* 499 F.2d 370, is a leading case adopting the approach of the ALI Model Penal Code which this court followed in *Stallworth, supra,* 543 F.2d 1038.

concluded beyond a reasonable doubt that one or more defendants acquired and had readily available explosives with the intention of carrying out the bombing charged in the count, or if it concluded beyond a reasonable doubt that one or more defendants reconnoitered and inspected a bomb target in planning for its destruction, then it might conclude that either of these acts, standing alone, constituted a substantial step in furtherance of the bombing.

We do not agree with defendants' assertion that these instructions amounted to the direction of a verdict once the jury had been convinced of the historical facts beyond a reasonable doubt. The judge told the jury that it "may" conclude, not that it must. He elaborated on this by saying:

> In each instance it is up to you to determine whether the acts of a defendant, individually or together with other acts, reaches the level of a substantial step in furtherance of an intended crime—and hence constitutes a criminal attempt.

Nevertheless we do not regard this form of instruction, for which the Government has cited and we have found no precedent, as desirable. Although it clearly is drawn from § 5.01(2) of the Model Penal Code, the Commentary indicates that this provision was intended for use by the judge not in charging the jury but in deciding whether to send a case to it. See Model Penal Code, § 5.01(2), Comment at 49 (Tent. Draft No. 10, 1960). Also, the instruction omitted to explain that reconnoitering and possession of explosives can constitute a "substantial step" only "if strongly corroborative of the actor's criminal purpose." Moreover, although the judge used all the appropriate words to prevent this, we think it far too likely that some jurors may have leapt to the conclusion that satisfaction beyond a reasonable doubt that a defendant had engaged in one of the enumerated acts relieved them of the harder task of determining beyond a reasonable doubt that his conduct had constituted "a substantial step in a course of conduct planned to culminate in his commission of the crime." Jurors should not be distracted from this central task. However, no objection was made at trial to this portion of the charge, and we surely cannot regard it as a plain error or defect affecting substantial rights, F.R. Cr.P. 52(b).

■ Nonetheless we cannot leave this subject without a further word. Under the sentencing pattern stated on pp. 55–56 *supra*, the sentences on Counts 5 and 6 had relatively little practical significance since they ran concurrently with the consecutive sentences on Counts 1 and 2. In light of our reversal of the convictions under Count 1, the sentences under Counts 5 and 6 become the sole bases for considerably lengthened terms of imprisonment. We have some doubt whether the district judge would have imposed such heavy sentences on Counts 5 and 6, more particularly the latter, if he had known that they would have this result. We thus vacate the sentences on these counts and remand to enable the district judge to reconsider them if he is so advised.

■ Although all of defendants' remaining contentions have been considered, the only one requiring any discussion is their attack on the charge on reasonable doubt. The judge began in approved fashion, see *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 139, 99 L.Ed. 150 (1954); *United States v. Magnano,* 543 F.2d 431, 436–37 (2 Cir.1976), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1100–01, 51 L.Ed.2d 536 (1977); 1 Devitt and Blackmar, Federal Jury Practice and Instructions, § 11.14 (3d ed. 1977), instructing the jury that "[a] reasonable doubt is such as would cause prudent people to hesitate in acts of importance to themselves." However, he then undertook to put it "a little differently", as follows:

> [I]f you are confronted, as indeed you are here, with an important decision and after reviewing all the factors that are pertinent for the decision you find yourself beset by uncertainty and unsure of your judgment, then you have reasonable doubt. Conversely, in the same situation, if you have taken into account all the elements that pertain to the problem and you find you have no real uncertainty, no

substantial reservation about your judgment, then you have no reasonable doubt.

Although creativity by district judges in enlightening juries is generally to be encouraged, a century's experience has confirmed the wisdom of the Supreme Court's observation that "[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." *Miles v. United States,* 103 U.S. 304, 312, 26 L.Ed. 481 (1881). Chief Judge Coffin of the First Circuit has pointedly observed that "appellate courts have repeatedly cautioned that attempts to explain reasonable doubt seldom clarify the concept and may flirt with an impermissible reduction of the prosecution's burden of proof", *Dunn v. Perrin,* 570 F.2d 21, 23 (1 Cir.), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978), and has wisely warned against "personal variations" and needless departures from standard formulations, *United States v. MacDonald,* 455 F.2d 1259, 1263 (1 Cir.), *cert. denied,* 406 U.S. 962, 92 S.Ct. 2073, 32 L.Ed.2d 350 (1972). At worst such variations may be prejudicial to a defendant; at best they add needlessly to the work of appellate courts while being of no real benefit to the jury. We cannot see what is wrong with the instruction recommended in 1 Devitt & Blackmar, Federal Jury Practice and Instructions § 11.14 (3d ed. 1977); [11] it is fair to both sides, touches all the bases and, being largely founded on decisions of the Supreme Court and courts of appeals, is seemingly immune from challenge having any possibility of success and therefore is not likely to become the basis of one. At least in the absence of an indication that a jury is having trouble in applying the standard instruction, trial judges would be exceedingly well advised to use that instruction rather than improvise variations upon it.

We have some fear that equating reasonable doubt with being "beset by uncertainty and unsure of your judgment" or having a "substantial reservation about your judgment", more particularly the former, may overstate the degree of uncertainty which reasonable doubt imports, putting it at some indeterminable point between the standard definition and the uncertainty that would defeat a plaintiff in a civil case.[12] We also think that while it is proper to instruct that beyond "reasonable" doubt does not mean beyond all "possible" doubt, the trial judge's embellishment, that "[i]ndeed, if the latter were the rule, few persons, however guilty, could ever be convicted," may be unduly favorable to the Government, see *United States v. Magnano, supra,* 543 F.2d at 437, and is best avoided. However, an instruction must be read as a whole, *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973), and the two-page charge on reasonable doubt was filled with entirely correct and appropriate language, which successfully conveyed the substance of the concept, see *United States v. Holland, supra,* 348 U.S. at 140, 75 S.Ct. at 139; *United States v. Magnano, supra,* 543 F.2d at 437. In any event, no objection was made to the charge, and the embroidery was certainly not "plain error" within F.R.Cr.P. 52(b), *United States v. Frady,* 456 U.S. 152, 164, 102 S.Ct. 1584,

---

**11.** That model instruction reads, in pertinent part, as follows: "It is not required that the government prove guilt beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his own affairs.

The jury will remember that a defendant is never to be convicted on mere suspicion or conjecture." A new model instruction is proposed in *Pattern Criminal Jury Instructions,* § 21, Definition of Reasonable Doubt, Federal Judicial Center, Committee to Study Criminal Jury Instructions (Fed.Jud.Ctr.1982).

**12.** The Seventh Circuit has expressed strong disapproval of the equation of "reasonable" with "substantial" doubt, see, e.g., *United States v. Wright,* 542 F.2d 975, 986–88 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977), but this circuit has been more tolerant, see *United States v. Magnano, supra,* 543 F.2d at 436–37 (2 Cir.1976). "Very substantial doubt" has been held to overstate the required degree of uncertainty, *United States v. Alvero,* 470 F.2d 981, 983 (5 Cir.1972).

**70**

1592, 71 L.Ed.2d 816 (1982). See also *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977).

The judgment of conviction under Count 1 (RICO) is reversed with instructions to dismiss the count on the ground that the conduct charged in the indictment and proved at trial did not constitute an offense under 18 U.S.C. § 1962; the sentences under Counts 5 and 6 are vacated and the cause is remanded to enable the district judge to consider resentencing; in all other respects the judgment is affirmed.