UNITED STATES of America, Plaintiff,

v.

Edwin Jesus SIERRA–GARCIA, also known as "Eddie Gomez," Anna Patricia Alvarez, Nestor Cardona, Maria Del Carmen Rodriguez–Alonso, and Caesar Ruiz, Defendants.

No. CR–90–0891.

United States District Court, E.D. New York.

March 18, 1991.

Loretta Lynch, Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

José M. Quinon, Quinon & Strafer, Miami, Fla., for Edwin Jesus Sierra–Garcia.

Carlos A. Velasquez, Montero, Finizio & Velasquez, Fort Lauderdale, Fla., for Nestor Cardona–Grajales.

Charles D. Adler, Goltzer & Adler, New York City, for Caesar Ruiz.

Robert Blossner, New York City, for Anna Patricia Alvarez.

Albert Talero, Law Offices of Byron Lassin, Jackson Heights, N.Y., for Maria Del Carmen Rodriguez–Alonso.

### MEMORANDUM AND ORDER

GLASSER, District Judge:

The defendant Sierra–Garcia moves pursuant to Rule 12(b), Fed.R.Crim.P., and pursuant to the Due Process and Double Jeopardy clauses of the Fifth Amendment, for an order dismissing the indictment on the following grounds: (1) Counts 2–4 and 6–8 are multiplicitous; (2) Counts 5 and 9 are multiplicitous; (3) Counts 1–4 and 6–8 fail to state cognizable offenses, and (4) 18 U.S.C. § 1956 is unconstitutionally vague.

■ The essence of his claim that Counts 2–4 and 6–8 are multiplicitous can be clearly understood with the provisions of 18 U.S.C. § 1956 in mind. The relevant portions of that statute provide as follows:

**§ 1956. Laundering of monetary instruments**

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

Count 2 of the indictment alleges that this defendant and the others named violated § 1956(a)(1)(A)(i) on October 5, 1990. Count 3 alleges that they violated § 1956(a)(1)(B)(i) on that date and Count 4 alleges that they violated § 1956(a)(1)(B)(ii) on that date. Counts 6–8 mirror Counts 2–4 except that the defendants are charged

with violating the statutory provision on October 9, 1990.

█ Multiplicity is the charging of a single offense in more than one count. *United States v. Israelski*, 597 F.2d 22, 24 (2d Cir.1979). "The multiplicity doctrine is based upon the double jeopardy clause of the Fifth Amendment which 'assur[es] that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.'" *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). The test for determining whether an indictment is multiplicitous was clearly stated in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932) as follows:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.... A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.

Citing *United States v. Albernaz*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981) and *United States v. Marrale*, 695 F.2d 658 (2d Cir.1982), *cert. denied*, 460 U.S. 1041, 103 S.Ct. 1434, 75 L.Ed.2d 793 (1983), the court in *United States v. Nakashian*, 820 F.2d 549 (2d Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987) pointed to those cases as establishing a

> [T]hree-step inquiry to determine whether Congress intended to authorize multiple punishments for conduct that violates two statutory provisions. 1) If the offenses charged are set forth in different statutes or in distinct sections of a statute, and each section unambiguously authorizes punishment for a violation of its terms, it is ordinarily to be inferred that Congress intended to authorize punishment under each provision. 2) It must next be determined whether the two offenses are sufficiently distinguishable from one another that the inference that Congress intended to authorize multiple punishments is a reasonable one.... 3) If *Blockburger* is satisfied, the final step is to test the tentative conclusion that multiple punishments are authorized against the legislative history of the statutory provisions to discover whether a contrary Congressional intention is disclosed. If the legislative history either reveals an intent to authorize cumulation of punishments or is silent on the subject, the court should conclude that Congress intended to authorize multiple punishments.

820 F.2d at 551.

An application of that test compels the conclusion that the indictment is not multiplicitous. As to the first step of the inquiry, the offenses charged are set forth in distinct sections of § 1956, each stated in the disjunctive. That is to say, the statute makes it unlawful to knowingly conduct a financial transaction which in fact involves the proceeds of an unlawful activity with the intent to promote the carrying on of the unlawful activity § 1956(a)(1)(A)(i); *or* knowing that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity § 1956(a)(1)(B)(i); *or* to avoid a transaction reporting requirement under State or Federal law § 1956(a)(1)(B)(ii). The statute also makes it plain that a violation of each section of the statute is punishable as prescribed.

As to the second step of the inquiry, the offenses are sufficiently distinguishable from one another to warrant the reasonable inference that Congress intended to authorize multiple punishments. That is to say a violation of § 1956(a)(1)(A)(i) requires proof that the defendant intended to promote the carrying on of a specified unlawful activity. A violation of § 1956(a)(1)(B)(i) requires proof that the defendant conducted a financial transaction knowing that it was designed in whole or in part to conceal or disguise one of the stat-

ed aspects of the proceeds of the specified unlawful activity. And finally, a violation of § 1956(a)(1)(B)(ii) requires proof that the defendant conducted a financial transaction knowing that it was designed in whole or in part to avoid a transaction reporting requirement. It is plain that "each provision requires proof of a fact which the other does not" within the meaning of *Blockburger.*

■ As to step three of the analysis, the defendant makes no reference to any portion of the legislative history reflecting a Congressional intent to preclude multiple punishment. Where the offenses are set forth in distinct sections of a statute which unambiguously sets forth a punishment for the violation of each distinct section as is the case here, and each offense requires proof of a fact that the other does not as is also the case here, then a court is warranted in presuming that the Congress intended to authorize multiple punishments. *See United States v. Gugino,* 860 F.2d 546, 549–50 (2d Cir.1988). The defendant's motion to dismiss Counts 2–4 and 6–8 as multiplicitous is, therefore, denied.

■ The defendant asserts that Counts 5 and 9 charge essentially the same offense as 18 U.S.C. § 1956(a)(2)(B)(ii) and must be dismissed as "lesser included offenses" of Counts 4 and 8. Count 5 alleges a violation of 31 U.S.C. §§ 5316(a) and (b) and 5322(b) on or about October 5, 1990. Count 9 alleges a violation of the same statutes on or about October 9, 1990. Those statutes make it unlawful to fail to file a report when knowingly transporting or about to transport out of the United States more than $10,000 at one time. 18 U.S.C. § 1956(a)(2)(B)(ii) makes it unlawful to transport a monetary instrument or funds out of the United States knowing that the monetary instruments or funds involved represent the proceeds of some form of unlawful activity and knowing that such transportation is designed in whole or in part to avoid a transaction reporting requirement under State or Federal law. It should be noted at the outset that Counts 4 and 8 do not charge the defendants with violating § 1956(a)(2)(B)(ii) and therefore Counts 5 and 9 do not charge a lesser included offense of that statute.

A discussion of "lesser included offenses" invariably arises in the context of whether a court's instructions to a jury regarding the law applicable to a specific offense should also include an instruction that the jury may return a verdict of guilt on a lesser included offense. Rule 31(c), Fed.R.Crim.P., provides, in that regard, that "The defendant may be found guilty of an offense necessarily included in the offense charged...." In *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734, *reh'g denied,* 490 U.S. 1076, 109 S.Ct. 2091, 104 L.Ed.2d 654 (1989) the Supreme Court resolved the conflict among the Circuits as to whether the "inherent relationship" approach or the traditional or "elements" approach should be applied to Rule 31(c). *Compare, e.g., United States v. Whitaker,* 447 F.2d 314, 319 (D.C.Cir.1971) (inherent relationship test) with *United States v. Campbell,* 652 F.2d 760, 761–762 (8th Cir.1981) (elements test). Under the "elements test" "one offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense. Where the lesser offense requires an element not required for the greater offense, no instruction is to be given under Rule 31(c)." *Schmuck,* 489 U.S. at 716, 109 S.Ct. at 1450. The court is not aware of any authority, nor has the defendant cited any, which prohibits charging as separate counts in an indictment, a greater and a lesser offense. The court's instruction to the jury would, in the normal course, require them to consider each count separately and may require such other instruction as may be appropriate. *See, e.g., United States v. DiGeronimo,* 598 F.2d 746, 751 (2d Cir.), *cert. denied,* 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979).

An analysis of the statutes involved, however, reveals that the elements of 31 U.S.C. § 5316 are not a subset of the elements of 18 U.S.C. § 1956(a)(1)(A)(i) or (a)(1)(B)(i) or (a)(1)(B)(ii) because the lesser offense (§ 5316) requires an element not required for the greater offense (§ 1956).

The lesser offense is committed when a person knowingly "transports, is about to transport or has transported" more than $10,000 outside the United States and fails to file a report as required by the statute. "Transportation," past, present or imminent, is a necessary element of this offense. "Transportation" is not an element of § 1956(a)(1)(A)(i), (a)(1)(B)(i) or (a)(1)(B)(ii). A *Nakashian* or *Blockburger* analysis would compel the same conclusion. The defendant's motion to dismiss Counts 5 and 9 is, therefore, denied.

■ The defendant next contends that the indictment should be dismissed as to Counts 1–4 and 6–9 for the reasons that (1) it fails to state a violation of 18 U.S.C. § 1956 in that "specified unlawful activities" in terms of discrete acts or indictable offenses are not pleaded as required by 18 U.S.C. § 1956(c)(7); (2) Counts 6–9 fail to allege sufficient facts to establish that an attempt to engage in a financial transaction occurred on October 9, 1990; and (3) Count 1 fails to state an offense because 18 U.S.C. § 371 does not prohibit conspiracies to attempt to commit other offenses.

■ Rule 7(c)(1), Fed.R.Crim.P., requires that an "indictment shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." The essential pre-requisites of a sufficient indictment are that it informs the accused of the charges against him so that he can prepare his defense and avoid double jeopardy. *United States v. D'Anna*, 450 F.2d 1201, 1204 (2d Cir.1971). A reading of this indictment in its entirety and with a modicum of common sense can leave the defendant with no doubt as to the offenses with which he is being charged so as to enable him to prepare his defense and successfully invoke the prohibition against double jeopardy should he be indicted again for the same offenses.

■ The defendant's assertion that "conspiracy to attempt" is not a crime has no merit. Count 1 charges the defendants with knowingly and wilfully conspiring to violate 18 U.S.C. § 1956 and 31 U.S.C. § 5316. He relies upon *United States v. Meacham*, 626 F.2d 503 (5th Cir.1980) in

making that assertion. *Meacham* was explicitly distinguished in *United States v. Mowad*, 641 F.2d 1067, 1074 (2d Cir.), *cert. denied*, 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 86 (1981) in which the court held that combining the general conspiracy statute (18 U.S.C. § 371) with a specific statutory provision describing an offense against the United States is sufficient to state an offense. *See also, United States v. Clay*, 495 F.2d 700 (7th Cir.), *cert. denied*, 419 U.S. 937, 95 S.Ct. 207, 42 L.Ed.2d 164 (1974).

The defendant's assertions addressed to the insufficiency of the other counts of the indictment similarly have no merit. The attack upon the sufficiency of the indictment cannot be supported by a claim that it fails to inform him of the offenses with which he is charged so that he can defend against them. Rather, it is an attack upon the failure of the government to plead in detail the evidence it intends to elicit to prove those charges. In Counts 1–4, 6–8, the defendant is informed that the "specified unlawful activity" to which § 1956 makes reference, is "narcotics distribution." § 1956(c)(7), in defining "specified unlawful activity" incorporates 18 U.S.C. § 1961(1) which explicitly includes "the felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States." 21 U.S.C. § 841(a)(1) makes it unlawful to distribute controlled substances. The term "financial transaction" as used in § 1956(a) is defined in § 1956(c)(4) and when read in the context of the indictment in its entirety adequately informs the defendant of the nature of the charge against him to permit the preparation of his defense.

■ The defendant's attack upon § 1956 as being unconstitutionally vague falls considerably short of its mark. To pass constitutional muster a penal statute must define the offense definitely enough so that an ordinary person can understand what he may not do and must define it in a way that discourages arbitrary and discriminatory enforcement. An additional requirement

or what is perhaps an elaboration of what has already been stated, is that in enacting a penal statute, the legislature establishes minimal guidelines to govern law enforcement. *Kolender v. Lawson,* 461 U.S. 352, 357–58, 103 S.Ct. 1855, 1858–59, 75 L.Ed.2d 903 (1983).

With that standard as a benchmark, would an ordinary person understand what § 1956 forbids? A plain reading of it compels the conclusion that he would understand that he can not conduct a financial transaction with what he knows are the proceeds of some form of unlawful activity with the intention of promoting specified unlawful activity; or with knowledge that the financial transaction is designed to hide the nature, source or control of the proceeds of the specified unlawful activity; or with knowledge that the transaction is designed to avoid a reporting requirement under State or Federal law. The statute defines in some detail the meaning of the words "knowing," "conducts," "transaction," "financial transaction" and "specified unlawful activity."

■ In discharging his burden to establish that the statute is unconstitutionally vague, the defendant must hurdle the presumption that duly enacted legislation is constitutional and that the legislature intended that interpretation which is constitutionally permissible if the statute is susceptible to more than one interpretation. *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987); *United States v. Thompson,* 452 F.2d 1333 (D.C.Cir.1971), *cert. denied,* 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972).

The defendant's contention that the words "knowing" and "avoid" and "proceeds" and "includes" and "involving" are vague is simply sophistry. Without burdening this opinion further by an extended discussion of the defendant's premises and of the cases he relies upon to support these premises and the cases the government discusses to establish their inapplicability, suffice it to say that the defendant's assertions are virtually identical to those the defendant advanced in *United States v.*

*Ortiz,* 738 F.Supp. 1394 (S.D.Fla.1990). In a thorough and carefully reasoned opinion the court in *Ortiz* rejected the claim of unconstitutionality for vagueness and for the reasons stated there, that claim is rejected here as well. *See also United States v. Kimball,* 711 F.Supp. 1031 (D.Nev.1989) and *United States v. Mainieri,* 691 F.Supp. 1394 (S.D.Fla.1988).

The defendant Sierra–Garcia has also moved, pursuant to Rule 12(b)(3), Fed.R. Crim.P., to suppress evidence seized on October 9, 1990 from the house at 1 Ann Place, Port Washington, New York and all evidence obtained as the direct and indirect results of that search.

The defendant Caesar Ruiz has moved pursuant to Rules 12(b)(3) and 41(f), Fed.R. Crim.P., to suppress evidence seized from the house at 353 Wilson Avenue, Lindenhurst, New York.

The defendant Nestor Cardona–Grajales has moved, pursuant to Rule 12(b)(3), Fed. R.Crim.P., to suppress evidence seized from the house at 98 Irma Avenue, Port Washington, New York.

The grounds upon which the motions are based are that there was no probable cause to justify the issuance of the warrant and that the warrant was issued in reliance upon an affidavit "recklessly" prepared by the affiant, Detective Matthew Martucci.

A determination of these motions necessarily requires an analysis of the affidavit of Detective Martucci. That affidavit, executed on October 9, 1990, is fairly summarized as follows:

During the weeks preceding October 9th, Detective Martucci and other law enforcement officers representing the Drug Enforcement Administration, the New York City Police Department and the New York State Police, investigated suspected narcotics trafficking involving the smuggling of millions of dollars of narcotics proceeds from Long Island to Bogota, Colombia. The investigation included surveillance of various locations and the inspection by agents of the United States Customs Service of large reels of cable wire shipped by the subjects of the investigation to Bogota.

On October 5, 1990 approximately seven million dollars secreted inside twenty cylindrical canisters of cable wire, was seized.

The house at 1 Ann Place is owned by Jackie DeLeon as a matter of record. Ms. DeLeon is the sister-in-law of Moises Gomez who was convicted in this court in November, 1989 of narcotics and money laundering offenses. The Ann Place house was offered as collateral to secure his release on bail but was rejected. The interior of the Ann Place house is shielded from view by painted windows and drawn blinds. It is not serviced by telephone and the only mail delivered to it is a monthly electric bill.

On September 19, 1990 a man later identified as Eddie Gomez (and later known as the defendant Sierra–Garcia) was observed entering that house carrying a large shopping bag. He was visited shortly thereafter by a then unidentified male, later known as the defendant Caesar Ruiz, driving a red Dodge Colt four-door sedan who left soon thereafter. Eddie Gomez was next seen leaving the Ann Place house during the evening of September 20, 1990. He entered a blue Toyota truck registered to Fiber & Plastic, Inc. ("Fiber"), 847 Second Avenue, New York, New York, which is the address of a private mail delivery service. He was then observed using three different pay phones in the vicinity of Port Washington.

On September 21, 1990, Gomez was seen leaving the Ann Place house carrying a black briefcase. He again entered the blue Toyota truck and used a pay phone on Northern Boulevard for approximately fifteen minutes before driving to a warehouse at 97–B Otis Street in West Babylon, New York. That same day, two men later identified as the defendants Ruiz and Nestor Cardona were seen leaving a house at 98 Irma Avenue, Port Washington, New York to which Gomez had been followed the previous day. Cardona was carrying a white plastic bag and both then drove to the Otis Street warehouse.

The Otis Street warehouse was monitored by video camera surveillance instituted on September 21, 1990 and is believed to be the place used by the subjects of this investigation as the central packing and storage location for millions of dollars of narcotics proceeds.

On September 26, 1990 Gomez arrived at the warehouse in the blue Toyota truck. Soon thereafter Ruiz and Cardona arrived in a blue GMC truck which was learned to be registered to Adan Alzate, 84–02 Roosevelt Avenue, Box 366, Jackson Heights, New York, the address of a shopping mall in which a private mailbox service was located. That service was used by Moises Gomez as the address for vehicles used by him and others to transport the proceeds of the narcotics operation for which he was convicted.

Also on September 26th, Gomez was observed removing twenty-four large cylindrical canisters and transporting them to Falcon Forwarding, Inc. ("Falcon"), 129 Hanse Avenue, Freeport, New York. Sometime thereafter, Gomez was seen bringing into the Otis Street warehouse from the blue Toyota truck five cardboard boxes, one wooden platform pallet and two empty cylindrical canisters identical to those previously transported to Falcon. Thereafter, Gomez left the Otis Street warehouse to purchase plastic wrapping insulation and an inkroller and returned there.

The investigation revealed that Falcon is a cargo shipping company that exports large shipments to foreign countries. Its records revealed that since March, 1990 it handled seventeen shipments of reels of cable wire to Bogota, Colombia on behalf of Fiber. The cable wire reels are generally delivered to Falcon by Gomez who pays the shipping charges in cash.

On September 27, 1990 an unidentified female, later known to be the defendant Rodriguez–Alonso who was present when Gomez previously removed the twenty-four canisters from the Otis warehouse, entered Falcon. She was heard by Detective Martucci to identify herself as being from Fiber and it was learned that she paid approximately two thousand dollars in cash for the shipping charges for the canisters delivered the preceding day.

On September 27th, Gomez arrived at the Otis Street warehouse in the blue Toyota from which he and Ruiz removed several large cardboard boxes and several large plastic bags and brought them into the warehouse. Soon thereafter Rodriguez–Alonso arrived in the red Dodge Colt which Ruiz had previously been observed driving. She removed a white plastic bag from that vehicle and entered the warehouse. Gomez and Rodriguez–Alonso drove to Bellmore, New York in the blue Toyota where they rented a U–Haul truck which Gomez drove back to the warehouse followed by Rodriguez–Alonso who drove the blue Toyota. Thereafter, Rodriguez–Alonso and Cardona departed the warehouse in the U–Haul and Ruiz departed the warehouse in the GMC truck. The two vehicles drove in a surveillance-conscious manner to an apartment complex at 1063 Palisades Avenue in northern New Jersey. Rodriguez–Alonso, Ruiz and Cardona removed household items and boxes from the apartment complex and loaded them into the U–Haul truck. Gomez was then observed arriving at that address in the blue Toyota and then left as the other three departed in the U–Haul truck. Both vehicles were then observed driving to 353 Wilson Avenue, Lindenhurst, New York, a one-family house. The four were observed unloading the things placed into the U–Haul in New Jersey and bringing them into this house.

On October 1, 1990, Gomez arrived at the warehouse in the blue Toyota from which he removed several cardboard boxes and carried them into the warehouse. He later left and when he returned he was assisted by Ruiz and Rodriguez–Alonso in removing a large container from the blue Toyota which was carried into the warehouse. Shortly thereafter, Rodriguez–Alonso left the warehouse and transferred a heavy gym bag, a white plastic bag and several boxes from the U–Haul to the red Dodge Colt. Rodriguez–Alonso was then observed to depart the warehouse in the U–Haul followed by Gomez in the blue Toyota. They drove to the Wilson Avenue house and Gomez removed several boxes which appeared heavy from the U–Haul and brought them into the house.

On October 2, 1990, Gomez was observed arriving at the warehouse shortly prior to the arrival there of Rodriguez–Alonso in the red Dodge Colt. At that time he carried several heavy cardboard boxes into the warehouse from the blue Toyota and after leaving, returned again with several more heavy boxes which he also carried into the warehouse. Approximately thirty minutes later he left the warehouse again after loading the blue Toyota with four flat long boxes, three other boxes and a hand truck, all of which he removed from the warehouse.

On October 3, 1990, Gomez was observed leaving the warehouse in the blue Toyota. Upon his return shortly thereafter, he, Rodriguez–Alonso and Ruiz removed three cylindrical reels of cable wire and two empty reels from the Toyota and brought them into the warehouse. Ruiz then placed what appeared to be empty cardboard boxes into the Toyota. Gomez then left in the Toyota and proceeded onto the Long Island Expressway to Port Washington where he exited. Surveillance was discontinued when Gomez entered a cul-de-sac facing passing traffic on Searingtown Road. Not long thereafter, Gomez was again seen at the warehouse where he and Ruiz in the presence of Rodriguez–Alonso removed from the Toyota several cardboard boxes which appeared heavy, placed them on a hand truck, and brought them into the warehouse.

On October 4, 1990 Gomez arrived at the warehouse in the Toyota from which Ruiz removed several cardboard boxes and brought them into the warehouse. Soon thereafter Gomez left the warehouse and drove to Port Washington where he was observed entering and leaving the house on Irma Avenue with one cardboard box, which appeared to be heavy, and placing it into the Toyota. Still later, Ruiz, with the help of Rodriguez–Alonso, removed a box from the trunk of the red Dodge, placed it on a hand truck and brought it into the warehouse.

On October 5, 1990 Gomez was observed leaving the Ann Place house with his black briefcase. He drove in a surveillance-con-

scious manner to New York City. That same morning, Ruiz and Rodriguez–Alonso left the warehouse in the red Dodge and rented a U–Haul. Ruiz drove the Dodge and Rodriguez–Alonso drove the U–Haul back to the warehouse. Moments later, Gomez arrived in the Toyota. He was then observed removing several cardboard boxes that appeared to be heavy from the Toyota and brought them into the warehouse. Gomez was then seen removing twenty cylindrical canisters from the warehouse and loaded them onto the U–Haul truck which he drove to Falcon where the canisters were unloaded.

It was learned from Falcon that on October 5th Gomez paid $2,659 in cash in payment of the shipping charges for the twenty canisters. Shipping documents reflected that twenty reels of wire were being shipped to Bogota.

During the evening of October 5th the twenty canisters were inspected by agents of the United States Customs Service. Each canister contained cable wire wrapped around the outside. Inside each was a thick layer of plastic wrapped around a cardboard cylinder. Inside each cylinder were large amounts of United States currency which totaled $6,729,000.

Based upon the foregoing, Detective Martucci expressed the belief, based upon his experience and the experience of other investigating officers, that the money was the proceeds of narcotics activity and requested search warrants for the Otis Street warehouse, the Irma Avenue, Ann Place and Wilson Avenue houses.

Chief Magistrate–Judge Simon Chrein granted the request and issued the search warrants.

The propriety of issuing the search warrant for the Ann Place house is challenged by the defendants Sierra–Garcia and Anna Alvarez. The defendant Ruiz challenges the search of the Wilson Avenue house and the defendant Cardona challenges the warrant insofar as it pertains to the Irma Avenue house. Each argues that the affidavit which has been reviewed in detail above does not provide a factual basis for a finding of probable cause to issue the warrant.

Sierra–Garcia and Cardona also assert that Detective Martucci acted "recklessly" in requesting the warrant and desire a hearing on that issue. Although not previously mentioned, there was, during the course of this investigation, a warrantless search of an apartment on 38th Street in New York City and the defendant Rodriguez–Alonso moved to suppress items seized as a result. The government has advised the parties that it does not intend to offer as evidence any item seized from that apartment and that motion is, therefore, moot.

A brief restatement of well settled principles applicable to motions to suppress evidence seized incident to a search pursuant to a warrant may be useful. To begin with, the person bringing the motion has the burden of proving that he had a legitimate expectation of privacy in the premises searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), *reh'g denied*, 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979). The movant seeking to suppress evidence obtained under a regularly issued warrant has the burden to show that the warrant was issued without probable cause, *United States v. De La Fuente*, 548 F.2d 528, 534 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977); *United States v. Smith*, 499 F.2d 251, 255 (7th Cir.1974).

The Fourth Amendment imposes no constitutional prohibition against a search and seizure pursuant to a warrant properly issued by a neutral and detached magistrate. Once a magistrate has determined that the facts set forth in the application presented to him are adequate and reliable and that the reasonable inferences to be drawn from them furnish probable cause to issue the warrant, that determination is entitled to substantial deference from the reviewing court. *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964). The finding of probable cause by a magistrate in and of

itself is a significant factor in declaring the validity of the warrant. *United States v. Follette*, 379 F.2d 846, 848 (2d Cir.1967). In reviewing the affidavit of Detective Martucci, giving due deference to the magistrate's finding, the reviewing court must keep clearly in mind the teaching of cases such as *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, *reh'g denied*, 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983) and *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879, *reh'g denied*, 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949) regarding the meaning of probable cause. That teaching is that probable cause exists if the magistrate had a substantial basis to conclude that a search of the premises described might yield evidence of a crime; that it is a practical and non-technical concept not readily reduced to a precise legal formula; that in a particular factual context, the existence of probable cause is to be viewed in a common sense, non-technical way.

▮ The motion to suppress the Ann Place house may properly be determined by an application of those fundamental principles. Neither Sierra–Garcia nor Alvarez has made any proffer by way of sworn affidavit or otherwise tending to sustain their burden of proving that they had a legitimate expectation of privacy in those premises. On the contrary, the affidavit of Detective Martucci reflects that the record owner of the Ann Place property is Jackie DeLeon and that the only mail ever delivered there is a monthly electric bill. To the extent that the other defendants named in this indictment seek to join in the motions of Sierra–Garcia, they clearly have not sustained their burden of proof as to their standing to bring the motion. It is also clear that the defendants have not sustained their burden of proving that the warrant was issued without probable cause.

Assuming that the frequency with which Sierra–Garcia was seen entering and leaving the Ann Place house would support the inference that he either resided there or otherwise had a legitimate expectation of privacy in those premises, a common sense appraisal of Detective Martucci's affidavit could only have led the magistrate to one conclusion, namely, that there was a fair probability that the search of those premises would yield evidence of a crime. *See Illinois v. Gates, supra; Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969); *Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964). That conclusion was, in addition, buttressed by Detective Martucci's asserted knowledge that based upon his experience and training, drug traffickers frequently have large amounts of money; that they frequently conceal and maintain books and records, and keep and conceal weapons and other "tools of the drug Trade" in a variety of containers and stash houses. Detective Martucci also cited Colombia, to which the huge sums of money were shipped, as a source country (of which the magistrate could have taken judicial notice); the clandestine way in which the money was packed for shipment ($6,729,000 had already been seized four days prior to the execution of Martucci's affidavit); the surveillance-conscious way in which the parties were observed to drive from time to time; the frequent use of pay phones, and the payment of substantial freight charges to Falcon in cash.

The magistrate properly relied upon the significance of those factors to Detective Martucci given his experience, training and expertise in narcotics investigations, in finding probable cause to issue the search warrant. *See, e.g., United States v. Fama*, 758 F.2d 834 (2d Cir.1985); *United States v. Young*, 745 F.2d 733 (2d Cir.1984) *cert. denied sub nom. Myers v. United States*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).

*The Wilson Avenue House*

▮ The defendant Ruiz, in an affidavit in support of his motion, swore that he moved into the Wilson Avenue house on August 1, 1990 and continued to reside there thereafter. Accepting his affidavit as true, Ruiz had a legitimate expectation of privacy in those premises. Insofar as his co-defendants joined in his motion, they proffered nothing to satisfy their burden of

establishing their legitimate expectation of privacy in those premises and their motions in this regard are denied.

■ Ruiz has not, however, carried his burden of showing that the magistrate did not have probable cause to issue the warrant. That conclusion is compelled by a common sense evaluation of the facts recited in the affidavit. Ruiz was continuously observed with the other defendants and participated with them in the loading and unloading of boxes, canisters and other items in or out of the Otis Street warehouse; the Wilson Avenue house; the apartment complex on Palisades Avenue in New Jersey, and was observed at the Ann Place house and the Irma Avenue house. Boxes similar to those regularly moved in and out of the Otis Street warehouse were moved into the Wilson Avenue house on September 28, 1990 and on October 1, 1990. The particular factual context in which these events occurred surely warranted the conclusion that there was more than a fair probability that these premises were used by the defendants in the pursuit of their criminal activity and will yield the objects specified in the search warrant.

The defendant Ruiz's attack upon probable cause is sought to be supported by his contention that the boxes and other things moved into his house were consistent with innocence—that is, they may have been mundane household accoutrements. That possibility does not preclude a finding of probable cause. In *United States v. Ivic*, 700 F.2d 51 (2d Cir.1983) the court addressed that possibility explicitly and observed that the fact that an innocent explanation may be consistent with the facts alleged, however, does not vitiate probable cause. 700 F.2d at 57. *See also United States v. Webb*, 623 F.2d 758 (2d Cir.1980). The motion of defendant Ruiz is, therefore, denied.

■ The defendant Nestor–Cardona moves to suppress evidence seized in the search of the house on Irma Avenue, Port Washington, New York, also claiming that the affidavit of Detective Martucci did not furnish the magistrate with probable cause to issue the warrant. Cardona's motion is not supported by any affidavit by him or anyone else having personal knowledge stating any basis for the assertion by him of a legitimate expectation of privacy in the Irma Avenue premises. Having failed to meet this threshold burden as to his standing to suppress the evidence seized pursuant to a search warrant, his motion may be properly denied. *See United States v. Gillette*, 383 F.2d 843, 848 (2d Cir.1967); *United States v. Gregory*, 611 F.Supp. 1033, 1044 (S.D.N.Y.1985).

■ Even if Cardona had standing, his motion would be denied for the additional reason that he has failed to meet his burden to show the absence of probable cause for the issuance of the warrant. Like the Ann Place and Wilson Avenue houses, the Irma Avenue house constituted yet another piece in the puzzle painstakingly assembled by the law enforcement team during the investigation of these defendants conducted over a number of weeks. On September 20, 1990, Sierra–Garcia was observed going from the house on Ann Place to the house on Irma Avenue. The following day, September 21, 1990, Ruiz and Cardona were observed leaving the Irma Avenue house and proceeding from there to the Otis Street warehouse. Cardona was carrying a white plastic bag at the time. On October 4, 1990, Sierra–Garcia left the Otis Street warehouse and drove the blue Toyota at a high rate of speed to the Irma Avenue house, which he entered. He was then observed leaving that house with a cardboard box that appeared to be heavy. He placed that box into the Toyota and drove off. The following day, October 5th, Sierra–Garcia delivered twenty canisters to Falcon. Those canisters, it was determined that day, contained nearly seven million dollars in cash.

The vehicular peregrinations of these defendants from one house to another, bringing in or carrying out from them similar cardboard boxes, coupled with the inferences drawn therefrom by Detective Martucci upon which the magistrate was justified in relying, together with such inferences the magistrate himself drew based upon his detached and neutral evaluation of the

facts, plainly provided the probable cause for the issuance of the warrant. Discharging the responsibility of a reviewing court in this matter and giving due deference to the magistrate's findings, I am driven to conclude that there was ample basis to believe that there was more than a fair probability that the premises searched would yield the evidence of criminal activity specified in the search warrant. For these reasons, the motion of Cardona and of his co-defendants who joined in it, are denied.

■ The defendants attack the validity of the search warrant on the ground that it was obtained by an affidavit "recklessly" sworn to by Detective Martucci. The exact nature of his "recklessness" is not shared with the court and this aspect of the defendants' motion need not detain us long.

■ Here, too, a restatement of basic principles points to the rejection of the motion. The leading case of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) teaches that an affidavit supporting a search warrant is presumed to be valid. It also teaches that an attack upon such affidavit "must be more than conclusory" and should specifically identify that portion of the affidavit charged to be false accompanied by a statement of supporting reasons. The attack here does neither and can not be seriously entertained. *See also United States v. Levasseur*, 816 F.2d 37 (2d Cir.1987).

■ Sierra–Garcia has also moved to suppress the evidence seized without a warrant, following the search of the canisters on the Falcon premises on October 5, 1990. That evidence was the $6,729,000 found in the twenty canisters to which reference has already been made.

I begin here too with the observation that the court has not seen an affidavit from Sierra–Garcia or from any other defendant or person having personal knowledge of the facts asserting a legitimate expectation of privacy in the canisters or in the premises of Falcon Forwarding. As has been heretofore discussed, that deficiency would make appropriate the summary denial of this motion for the reason that no defendant has standing to make it. I will, in any event, address the merits of this motion which is bottomed upon the claim that a warrantless search is presumptively unreasonable and therefore unlawful unless it can be rescued from that infirmity by a recognized exception which, the defendants assert, is not available in this case.

A brief restatement of well settled principles having specific relevance to this search and seizure might be useful at this juncture as well:

*United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977) is oft cited for the principle that:

> Border searches, ... from before the adoption of the Fourth Amendment, have been considered to be "reasonable" by the single fact that the person or item in question had entered into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself.

Although *Ramsey* spoke of persons or things *entering* our country, the sovereign power to search persons or things *leaving* our country was recognized in *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 63, 94 S.Ct. 1494, 1518, 39 L.Ed.2d 812 (1974) in which the Court observed that:

> those entering and leaving the country may be examined as to their belongings and effects, all without violating the Fourth Amendment....

Several years later the Court of Appeals for this Circuit, relying upon *Shultz*, explicitly held that the border search exception applies to items leaving this country as well as entering it. *United States v. Swarovski*, 592 F.2d 131, 133 (2d Cir.1979). That extension of the border search doctrine to persons or things leaving the country is also reflected in at least two statutes, namely, 22 U.S.C. § 401 and 31 U.S.C.

§ 5317. The former provides in relevant part:

> Whenever an attempt is made to export or ship from or take out of the United States any arms or munitions of war *or other articles in violation of law,* or whenever it is known or there shall be probable cause to believe that any ... *other articles* are intended to be or are being or have been exported or removed from the United States in violation of law, the Secretary of the Treasury, or any person duly authorized for that purpose by the President, may seize and detain such ... other articles. All ... other articles ... seized pursuant to this subsection shall be forfeited. (Emphasis added)

Several things should be noted here. First, the statute has been construed to authorize searches as well as seizures. *United States v. Ajlouny,* 629 F.2d 830 (2d Cir.1980). Second, the search and seizure of articles intended for export is not limited to the border. Third, *Ajlouny* decided that "The statute applies in terms to arms and munitions, but includes 'other articles' and has been consistently applied to *any items* destined for unlawful export." *Id.* at 835 (emphasis added). 31 U.S.C. §§ 5316(a)(1)(A) and 5322, as has been previously discussed, make it unlawful to transport more than $10,000 out of the United States without filing a prescribed report. In addition, 19 C.F.R. § 162.21 provides:

> Property may be seized, if available, by any Customs Officer who has reasonable cause to believe that any law or regulation enforced by the Customs Service has been violated, by reason of which the property has become subject to seizure or forfeiture.

Annexed to the government's memorandum of law in opposition to these motions is an affidavit by Richard Dallesandro, a Special Agent with the United States Custom Service who states that his assistance was requested by Detective Martucci, on October 5, 1990, to inspect the canisters being shipped from Falcon's warehouse to Bogota, Colombia. Upon arriving at the Falcon premises, he was briefed by Detective Martucci and members of the New York Drug Enforcement Task Force as to their investigation and he examined the airway bill pertaining to the canisters which indicated that they were to be shipped directly to Bogota, Colombia, by air, through Challenge Air Cargo of Miami. The record owner of the canisters was listed as Fiber & Plastic Corp. (The airway bill is also attached to the government's memorandum.) Special Agent Dallesandro concludes by stating that after reviewing the airway bill, he and other Customs Inspectors "performed an outbound or 'export' customs examination of the twenty canisters. Inside the canisters we discovered a quantity of U.S. currency totaling approximately $6,729,000, concealed within cardboard cylinders underneath wrappings of plastic and cable wire. The currency was then seized." A plain reading of 22 U.S.C. § 401 authorized the search and seizure of the canisters.

31 U.S.C. § 5317(b) provides:

For purposes of ensuring compliance with the requirements of section 5316, a customs officer may stop and search, at the border and without a search warrant, any ... container, and any person entering or departing from the United States.

This statute contains a limitation absent from 22 U.S.C. § 401, namely, "at the border." It may be fairly argued that making explicit reference to § 5316, the violation of which is charged in this indictment, § 5317(b) is properly applicable rather than 22 U.S.C. § 401. It should be noted that as in effect on October 5, 1990, § 5317(b) did not require customs officers to have reasonable cause to believe that currency violations were being committed before conducting a search. The issue then is whether the search of the canisters at Falcon was a search "at the border." The word "border" in this connection, is not construed as meaning the precise line marking the boundary of a sovereign's territorial limits. Courts have recognized the practical necessity of a warrantless search after a person has cleared an initial customs checkpoint and entered into the Unit-

ed States' "extended border." A reasonable suspicion is required to support an "extended border" search. *See, e.g., United States v. Gaviria,* 805 F.2d 1108, 1112 (2d Cir.1986).

■ In *Almeida–Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973), the Court noted:

> Whatever the permissible scope of intrusiveness of a routine border search might be, searches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well.

A "functional equivalent" border search requires neither probable cause nor reasonable suspicion to be valid. *See generally* 94 A.L.R.Fed. 372, 400; *United States v. Gaviria,* 805 F.2d 1108, 1123 (2d Cir.1986). The applicability of the principle was said to extend to *"items imminently to be exported,* whether or not accompanying the traveler. Application of the border search exception depends upon the nexus between the goods and a border crossing, regardless of the circumstances under which the property subjected to search moved or will move across the border." *United States v. Ajlouny,* 629 F.2d 830, 834 (2d Cir.1980) (emphasis added).

The canisters here were, beyond cavil, imminently to be exported. They were delivered to the freight forwarder, the shipping charges were paid in cash and an airway bill prepared. There was a patent nexus between the goods and the border of the United States it was imminently to cross. Upon any rational balancing of the sovereign's interest to stem the clandestine and illegal flow of its treasure beyond its borders to a foreign country against the privacy interest of the shipper, the balance must be struck in favor of the sovereign. This is especially true in this case where the legitimate expectation of privacy in these canisters has not been hinted at by any of the defendants.

In *United States v. Chabot,* 193 F.2d 287 (2d Cir.1951), the defendant was convicted of possessing gold bullion without a license. Arguing for reversal on appeal, Chabot contended that agents conducted an unreasonable search of his car to find the gold which was hidden behind the fenders. The car had already been delivered to the freight agent when the customs men began to inspect it. In rejecting his argument, the court noted that "The right of customs officials to inspect cargo being shipped abroad is apparent." *Id.* at 290. The court went on to add that 22 U.S.C. § 401 dispensed with the necessity of a search warrant.

In *United States v. Cardona,* 769 F.2d 625 (9th Cir.1985), customs agents in California learned that Cardona, a suspected drug dealer, was sending cashier's checks via Federal Express to California. A Federal Express truck to which two packages believed to contain the cashier's checks was delivered was stopped by a customs agent who requested to see them. One package was destined for Florida via Federal Express and then to Colombia via Tampa Express. The agent opened the package destined for Colombia which he found to contain $20,000 in cashier's checks. Recognizing the difficulty in differentiating in any given case between an extended border and functional equivalent border search, the court held that this search, occurring 3,000 miles from the border it was to cross and twenty-four hours before the scheduled crossing was a valid border search and the agent was permitted to testify to what he found in the package. *See also United States v. Udofot,* 711 F.2d 831 (8th Cir.), *cert. denied,* 464 U.S. 896, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983).

■ The defendants here argue that the October 9th search warrant, issued in part upon information obtained from the October 5th search of the canisters, was tainted and for that reason should be declared invalid. A similar argument was made in *Udofat* and rejected. The search of the canisters being a valid border search, what it revealed and was made known to the magistrate could not have tainted the search warrant.

The motion to suppress evidence seized in the warrantless search of the canisters is denied for all the foregoing reasons.

■ The defendants have submitted extensive exhibits in support of their motion to exclude evidence of a narcotic detector dog's "alert" to the presence of narcotics on currency seized. They contend that such evidence is not scientifically reliable. The issue is not one of scientific reliability; it is, rather, one of relevance and the weight the jury will give to the reaction of the dog. The defendant will have opportunity to cross-examine the dog's handler and explore the reliability of such a reaction based upon past experience. *See United States v. Ospina,* 798 F.2d 1570, 1583 (11th Cir.1981); *United States v. Thomas,* 757 F.2d 1359 (2d Cir.1985); *United States v. Waltzer,* 682 F.2d 370 (2d Cir.1982). This motion is denied.

■■ In denying the motion to suppress for the reasons discussed, I am also denying the defendants' request for an evidentiary hearing in connection with those motions. I do so because insofar as the motion is predicated upon a want of probable cause to issue the warrant, a review of the affidavit of Detective Martucci so convincingly satisfies every judicially declared test to determine probable cause as a matter of law that an evidentiary hearing would serve no useful purpose and would cause a wasteful use of judicial and public resources. Similarly, as concerns the October 5th search of the canisters, it would have sufficed to deny the motion for the reason that there hasn't been a scintilla of a proffer by any defendant to suggest standing to bring the motion without an extended discussion of border searches.

■ The defendants have also moved for a bill of particulars. Once again, a restatement of fundamental principles may be useful. A bill of particulars is appropriate to permit a defendant to identify with sufficient particularity the nature of the charge pending against him, to enable him to prepare for trial, to prevent surprise and to assert double jeopardy if prosecuted again for the same offense. *United States v. Davidoff,* 845 F.2d 1151, 1154 (2d Cir.1988); *United States v. Bortnovsky,* 820 F.2d 572 (2d Cir.1987). It is not whether the information sought would be useful to the defendant but rather whether it is necessary to a defense. *United States v. Leighton,* 265 F.Supp. 27 (S.D.N.Y.1967). A bill of particulars is not obtainable to permit the defendants a preview of the government's evidence or the theory of the government's case—in sum, it is not a discovery tool. *United States v. Culoso,* 461 F.Supp. 128 (S.D.N.Y.1978), *aff'd mem.* 607 F.2d 999 (2d Cir.1979). The granting of a bill of particulars is discretionary with the trial judge. *United States v. Panza,* 750 F.2d 1141 (2d Cir.1984).

With those principles in mind and after reviewing the indictment, the complaint, the affidavits in support of the search warrant, the defendant's motion for a bill of particulars is denied.

SO ORDERED.